# POTTER, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

St. Louis Court of Appeals, Submitted February 3, 1909, Opinion Filed March 9, 1909.

1. **DAMAGES: Death: Penalty: Discretion of Jury.** Section 2864, Revised Statutes 1899, as amended by the Act of 1905, fixes a penalty, in cases where death results from the acts of negligence defined in the section, at a sum of not less than $2,000 and not exceeding $10,000, "in the discretion of the jury;" the statute is still a penal one though the jury has certain limits of discretion in fixing the amount of the penalty.

2. ————: ————: **Instruction: Measure of Damages.** In an action on a death claim under section 2864, Revised Statutes 1899, as amended by the Act of 1905, the defendant could not be heard to complain that the court did not instruct the jury regarding the measure of damages where the defendant itself asked no such instruction; whether or not it would be proper for the trial court to direct the jury regarding the measure of damages any further than to keep them within the limits fixed by statute is not decided.

3. **PRACTICE: Instruction: Self-Invited Error.** Where a party to an action asks, and the court gives, an erroneous instruction, such party cannot be heard to complain that it is erroneous nor that it is in conflict with a proper instruction given for the other party.

4. **EVIDENCE: Expert Testimony: Speed of Trains.** It is not necessary to qualify a witness as an expert in order that he may testify in regard to the speed of a train; if he is familiar with trains and accustomed to seeing them run, that is sufficient to admit his testimony.

5. ————: **Stopping Train: Negligence.** In an action against a railroad company for damages on a death claim, the deceased having been struck by a moving train, where one of the issues was whether the engineer had used proper effort to stop the train after seeing the peril of the deceased, the engineer testified that the application of the air brakes for the sudden stopping of a train would result in a jar as in case of a collision and that he made such application. *Held*, it was competent to show by a passenger riding on the train that she felt no jar or any sudden stopping of the train, for the purpose of showing failure to use proper effort to stop.

6. NEGLIGENCE: Prior Contributory Negligence: Last Chance. In an action against a railroad company on a death claim, where it was shown that the deceased, an old man, got upon a railroad track, although negligently, and walked down the track with his head down obviously unconscious of danger, and where the engineer, in charge of the train approaching him from the rear, could have seen him in time to have saved his life by the use of ordinary care in warning him or stopping the train, his widow was entitled to recover.

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

AFFIRMED.

*L. F. Parker, W. F. Evans* and *Moses Whybark* for appellant.

(1) Under the uncontradicted evidence of both the plaintiff and the defendant the plaintiff was not entitled to recover, and the court should have given defendant's instructions so declaring. Zimmermann v. Railroad, 71 Mo. 476; Purl v. Railroad, 72 Mo. 168; Maloy v. Railroad, 84 Mo. 270; Carrier v. Railroad, 175 Mo. 470; Aldrich v. Transit Co., 101 Mo. App. 77; Shanks v. Railroad, 101 Mo. App. 702; Jackson v. Railroad, 157 Mo. 645; Carr v. Railroad, 195 Mo. 214. (2) The defendant's employees had a right to presume that the deceased would get off the track in due time after the signals were given. Holwerson v. Railroad, 157 Mo. 232; Bunyan v. Railroad, 127 Mo. 18; Bell v. Railroad, 72 Mo. 62; Sinclair v. Railroad, 133 Mo. 240; Guyer v. Railroad, 174 Mo. 350. (3) The fact that the deceased was aged, infirm and partially deaf does not add to the plaintiff's right to recover for his death; in any event, not unless the defendant's employees knew it, and they did not. Barker v. Railroad, 98 Mo. 52; Schmidt v. Railroad, 191 Mo. 215; Maloy v. Railroad, 84 Mo. 270; Reardon v. Railroad, 114 Mo. 404; Trudell v. Railroad, 126 Mich. 73.

STATEMENT.—Action by respondent, plaintiff below, against the defendant railway company, appellant, to recover damages for the death of her husband which took place at Holland, in Pemiscot county, on the twenty-second of June, 1905. The petition is in the usual form, charging negligence on the part of the defendant and claiming $10,000 damages. The answer, after a general denial, sets up contributory negligence, to which a general denial was filed by way of reply. From the evidence in the case, it appears that the deceased, Jonathan Potter, was a man about seventy-four years old, a tall, slender man, walked stoop-shouldered and in rather a tottering manner, often using a cane; had been crippled some years before by an accident which he met with while employed in a sawmill, and was slightly deaf. His occupation was that of an ordinary laborer in a country town, working on farms and at different jobs, and it was developed by the defendant in the course of the cross-examination of plaintiff, that the family consisted of Potter, his wife and three children, and that he made most of the living for the family by his own labor. On the day of the accident, he had on a red shirt and no coat. The tracks of the defendant's road ran through Holland from a northeasterly to a southwesterly direction, Holland being some distance south of Caruthersville and being a town of some hundred or more inhabitants. The railroad line divides the residence district about equally, it being to the east and west of the road. Potter resided in that part of the town to the east of the road. There is a depot at Holland, the platform of which is about two hundred feet long. On the day of the accident the train which occasioned it was coming from the north toward the station, at about five o'clock in the afternoon, about on time. It had been raining that day and the rails were slippery. About seventy-two feet north of the north end of the station platform, there is a street crossing; at six hundred and twenty feet north

of the end of the station platform is a country road crossing and one hundred and ninety feet beyond that is a water tank. The plat used in evidence by defendant places the water tank eight hundred and twenty feet beyond the north end of the station platform. The railroad was in good condition, laid with heavy steel rails, rock ballasted, and, while practically straight for a long distance south of the station, to the north it was on a slight curve to the west as the track comes from the north. As is usual the witnesses differed in their estimate of distances. The defendant put in evidence a plat, drawn to scale. We take the distance as given on the plat, with this difference, that what is called the street crossing, where Potter entered on the track, is marked "road crossing," and what is referred to as road crossing, meaning the country road, is designated "street line." Assuming the plat is drawn to scale, these distances used by us are correct; only the names of the points given on the plat not corresponding to the testimony, and in designating them we follow the testimony. The track was in plain view from the country road crossing certainly, possibly from the tank, clear to the station. There were no buildings or other obstruction near the railroad on either side of it north of the depot for the distance of about a quarter of a mile. The land on either side of the road is level and where the road passes through the town from the street crossing to the platform or depot, it is low and wet and the ti ches or borrow-pits along the sides are usually filled with water. The people of the town had, ever since the construction of the road, used the portion between the tracks extending from the street crossing to the depot platform as a footpath in going to and from the depot. Potter had been in the habit, when around town, of going over to the depot and watching the arrival of the trains, and in going to and from the depot had always traveled on the railroad track from this street crossing to the depot platform. The

people of the town living on the east side of the railroad used the track in like manner. On the day of the accident, Potter left his house at about the time for the arrival of the southbound train and going on to the track between the rails, at what we call the street crossing, seventy-two feet north of the north end of the depot platform, was walking south on it toward the depot platform. There is evidence to the effect that when he came upon the railroad at the street crossing, he stopped and looked up and down the track, and seeing no train, started down the track to the depot platform. He walked slowly and in a stooping position. The train which caused the accident was a passenger train, comprising the engine, tender and three coaches; it was equipped with air brakes and appears to have been in perfect control of the engineer.

Giving the defendant the full benefit of the testimony of its main witnesses, we follow that of the fireman and engineer in describing the accident. The fireman was in his place on the engine, on the seat box, on the left hand side, that is on the east side of the train as it was running, and as Potter was struck as he was crossing or had crossed to the left or west rail, the boiler and the cab on the front of the locomotive being between the fireman and Potter, the fireman says he did not see Potter the instant he was struck but had seen him just before. He further testified that the engineer blew the whistle as quick as Potter got on the track and that the bell was ringing. After the sounding of the whistle and of the bell, the fireman testifies that he did not observe Potter increase his gait. He further testified that the engineer sounded the whistle at the signal station above town and set the air. This signal station appears, according to the evidence, to have been about at the road crossing or between that and the water tank. He testified that at that time

136 App—9

the train was running at about thirty-five or forty miles
an hour.  After the engineer whistled for the station
he slowed down.  The curve in the road appears to be
about where this water tank is, and the fireman testi-
fied that after the engineer got by the tank, he released
the air, and after he had released it applied it again
to the brakes at the road crossing, which, he says, "is
about one hundred and seventy-five yards north of the
depot."  In point of fact, as we have seen, it is about
six hundred and thirty feet or two hundred and ten
yards north of the depot.  After the engineer applied
the emergency brake, the train was going at the rate
of about "five or six miles an hour," said this witness;
that was before the emergency brake had been applied.
On cross-examination the fireman said that he knew
where the public road is north of the station; did not
appear to know where the street crossing is; that the
engineer had whistled for the road; had whistled for
the station something like a mile north of it and then
north of the public road crossing he whistled for "the
red board," as it is called, that is the signal board which
controls the approach of trains to the station and which
is handled from the station, the red or white face being
turned as a signal to the approaching train.  When
the engineer whistled for the station he was right at
the public road crossing, about at the water tank—
between the tank and the road crossing, but "right
about the tank," said the witness.  He estimates this
tank as located about forty or fifty yards north of the
public road crossing.  In point of fact, as we have seen,
according to the measurement on the plat, it is one
hundred and ninety feet or sixty-three and one-half
yards north of the public road crossing, and it was
about at this tank that the engineer "whistled for the
red board," and answered it by sounding the whistle
again to indicate he saw and understood.  This point
was "about two hundred yards north of the place where
Potter was struck and killed," said this witness.  The

Potter v. Railroad.

speed of the train had been cut down for the station before the train got to the tank and curve and then the engineer applied his air brake again, but the witness does not know whether he released or put it on afterwards, but says witness, "after he saw he was going to strike the man he put it on." Does not know exactly where the train was when Potter got on the track. Witness saw him but doesn't know whether the engineer saw him. "There was nothing to keep him (the engineer) from seeing Potter, although the engineer would not have as plain a view of him getting on the track as I did, because Potter got on to the track on my side," and then he was immediately in front of both of them, that is of both the engineer and fireman. Noticed that Potter was a tall man, walked in a stooped position and was gray-headed. Asked if he could tell how far they were from Potter when he first saw him; said he did not think it was as much as half a mile, "You can't see that far from the depot." That is to say the curve occurs within about a quarter of a mile of the end of the depot; from the water tank or from the public road crossing, it appears to straighten out. (In the plat furnished us by defendant, however, this curve is so slight as to be hardly noticeable.) Doesn't think he said anything to the engineer about seeing Potter on the track. After Potter passed out of his sight, that is after Potter had got over toward the right-hand rail and was out of the line of vision of the fireman, he asked the engineer if he had hit him; asked the engineer that, while he was trying to stop the train. Thinks that Potter was going upon the track, that is, about to enter upon the track when the engineer called for the "red board." He repeats that the curve in the track is right at the tank, and that, "You can't see the depot until you get around this curve." Asked if he saw Potter before the engineer did, said that he doesn't know whether he did or not but he thinks that they saw him about the same time and that when he saw

Potter enter on the track the engine was running just about on a straight line; where the track was straight. (This witness's idea of distance was very confused. He testified that to the best of his judgment, the place where Potter got on the track was fifteen or eighteen feet from the end of the platform and at that time the pilot of the engine was about fifty yards north and away from the platform and that it was then that the engineer gave the signal at once and applied the brakes and that the bell was ringing. The plat in evidence contradicts this and there was abundant testimony to the effect that this witness was in error in his estimate of distances.)

The engineer testified that at the time of the accident he was at the right-hand side of the locomotive, the locomotive being headed south, and that that is the proper station for the engineer; could not say "just to the dot" how far Potter was from him when he first discovered him on the track but should judge that he was about forty or fifty steps. Being asked if he had seen him before that time and if not, why not, he said, "When you are going into Holland south on an engine you turn round a curve right there, just by the water tank; like, for instance, this is the track now here; I am on this side of the engine; when this engine starts out here I am looking off here; I couldn't look around there; a man would have to have a twice eye; and as the engine makes the curve the farther she curves the farther you can see until you strike the straight." The curve is as you are going south, bends around to the west. Saw Potter just as he left the curve and struck the road crossing, "just as I hit the edge of the road crossing is when I saw him. . . . He couldn't have been over thirty-five or forty feet." Potter was walking right down the track. Blew the whistle at him and reversed the engine; "whistled at him until about the time we hit him." It would not take over a second to blow four blasts of the whistle. When he saw Pot-

ter, the train was running about fifteen miles an hour and then he tried to stop it; went at it by using the brakes. When he saw the engine was not going to stop with the brakes he reversed her, that "is made her work against herself;" applied the train brake and the air-brake, the train brake being operated by air from the engine, as is also the engine brake. What he means to call the other brake, he says, is "the reverse lever;" it is no brake but "it changes the motion of her link motion and when she is backing up she is trying to back up against herself." At that time, when he applied the brakes, he was running at the rate of about fifteen miles an hour, anyhow. At the rate of speed he was running he could not have stopped the engine after discovering the position of Potter. "You would have done pretty well if you would have stopped it in a hundred feet." After applying the emergency brake, would judge the distance he ran was probably one hundred feet. The usual stopping place at Holland is for the locomotive to stop its length south of the platform. Stopped the locomotive this time about two car-lengths sooner than the usual stopping place. Suppose the coaches are thirty or thirty-five feet long. In coming toward Holland that day, sounded the station whistle at the station whistle crossing, where there is a whistling board located, placed there so that you can tell when you are coming into the station, and when the locomotive reaches that board, the engineer is supposed to whistle for the station, to give one loud whistle. At the time he whistled at this whistling station the train was going at the rate of about thirty-five miles an hour. When they whistled for the station they always slowed up for the curve, cut speed down to fifteen or twenty miles an hour as they hit the curve; and check up to go into the station, "and commence making your station stop." Did that on this day. When he whistled for the station, he shut off steam; commenced using the station stop about the time he was hitting the edge

of the street, just as he started to hit the straight track as he came around the curve, and that is where he saw the man, and when he got near the crossing (that is, the street crossing), he threw "it all on;" that is threw all the air pressure on (seventy pounds in this case) and reversed the engine. Had a wet rail that day, and that fact made a little difference in trying to stop, because the brakes will not hold like they will on a dry rail; would make the difference of about a car-length in running at the speed they were going at that time. When he first sounded the whistle, Potter was between the rails, walking toward the depot. "He never done anything, only seemed to keep walking; was kind of hugging the right rail as though he was figuring on getting off at the depot." This rail that he was getting off on was on the west side. When the locomotive struck him, says the engineer, "he looked to me just as if he was figuring on going to step from the rail. . . . He seemed to me as though he were raising up his right foot to step over the rail when she hit him." Was walking at a very slow gait. Did not know anything about Potter's age, or physical condition, or about his hearing; would think he was somewhere about forty or fifty feet from Potter when he sounded the emergency whistle. Could not possibly have stopped the engine after he discovered the position of Potter, and could not have discovered his position on the track before he did because he (witness) was on the outside of the curve and could not see on a straight line. (It will be observed that this is directly opposite to the testimony of the fireman and is entirely inconsistent with the witness's own testimony, for he follows it with the statement, when asked when he next whistled, that the next time he whistled was for the road crossing. The road crossing that he is referring to, he says, is fifty or sixty feet south of the signal station; says he whistled four times for the crossing, then the next time he whistled, was for the "red board," he says, and when he had

Potter v. Railroad.

passed the tank, he blew four whistles. Asked how far that is south of the road crossing, he said it was possibly fifteen or twenty feet, maybe twenty feet. This is contradicted by the plat, which shows that the tank is about one hundred and ninety feet north of the public road crossing, and located on the plat of the defendant as eight hundred and twenty feet north of the north end of the platform. The next signal he gave, he says, was when he answered the board when they gave it to him, then he sounded two whistles; that was directly after the other. "All you can see ahead from the position of the engineer is straight ahead." Looks out through the front window; has a side window and a front window. Until they got on a straight line, could not see any distance ahead; saw Potter when he (the engineer) got on the straight line and sounded the whistle. When he sounded the whistle the train was running thirty-five miles an hour; that was when he whistled for the station and applied the air and slowed down to about fifteen or twenty miles. They could slow the train down to that rate of speed without jarring the train too much in about thirty yards of run. In making the regular stop at Holland without an emergency would make the same application that he did coming around the tank; they all did that around a curve, cutting it down to fifteen or twenty miles an hour. On cross-examination he stated that the lighter a train is the harder it is to stop it. His engine was in first-class shape and condition and had all modern appliances. Did not see Potter until his engine got to the street crossing, then applied the air; threw on the whole seventy pounds of it; if the train had been running five or six miles an hour, possibly could have stopped it, with all the pressure turned on, in fifty or sixty feet. It was not raining at time of accident, but it had been raining all day, just a sort of a spring shower. The street crossing where the locomotive was when he first saw Potter, he should

say, was over forty or fifty feet from the end of the platform and that is where he applied the air pressure for the first time; had not seen Potter until just as the engine came by or on to the street. The engine was "right there by the street" when he saw Potter; had applied the air in coming around the curve to check for the curve, whistled all the signals at the crossings; had passed all the crossings when he whistled the danger signal; endeavored to stop the train before he whistled; endeavored to stop the train on the street crossing; saw Potter first when he (witness) got to the street crossing; right then and there endeavored to stop his train and was then forty or fifty feet north of the end of the depot platform where Potter was hurt. When he sounded the danger whistle was crossing the street and when the whistle stopped, was within two or three feet of Potter. In coming into the town that time, had whistled sixteen or eighteen times, but not at Potter. Witness was on the west side of his train, that is the right side of the locomotive in running south, on the right-hand side. During the time he was coming from a mile north of town to the depot, was sitting on the right side of the locomotive in his usual place, with a window on his right-hand and a window in front; could see to the right and in front; looked through the front window while approaching Holland; when approaching the water tank looked toward the water tank, looking out at the right-hand side; when he reached the road crossing was looking out in front, and looking out that way, "you would be looking out behind the depot." When he signaled for the "red board," had not got to the road crossing. The "red board" stands right square in front of the depot, over the platform, doesn't reach to the track; it is a little to the west of the track as you go south and when he whistled for that he was north of the public road crossing; saw this "red board" by leaning out of his cab. When he looked for the "red board" was looking

for anything else that might be in front; when he looked out for this "red board" was north of the public road crossing, just about at the public road crossing, and that is the time when he saw Potter, just as he (witness) was crossing the road crossing and when he whistled, looking out to see the signboard he saw Potter; doesn't know how far the public road crossing is north of the street crossing. Had the distance from the public road crossing north of the depot down to the place where Potter was killed in which to check his train. At the rate he was running could have stopped the train in one hundred feet. Asked by a juror if at the speed he was running when he reversed the engine and put on the air, it would throw passengers out of their seats or jar the train, answered, that "they ought to all know it; that when you use the emergency brake it goes like in a collision, the train rebounds," that is, when it comes to a stop it will surge back and forward two or three times. On re-direct examination the engineer stated that when he whistled for the "red board," the engine was coming right up to the road crossing farthest north and that right then, when he looked out to see the "red board" and whistled for it, that that is when he saw Potter and that he then went to trying to stop; right then, and then is when he threw the air on, and he repeats that he "guesses" he was forty or fifty feet north of the north end of the platform, and that that was where he whistled for the "red board." Asked if he could not give the distance he said, that if he knew what the distance of the crossing was, he could tell, but that he didn't know the distance of the crossing; did not mean the crossing north of the platform but meant the one above that, and then it was, while there, that he looked out and saw the "red board" and saw Potter on the track, and that just as he looked for the "red board," he saw Potter and threw the air on and commenced whistling right there. (It might be said here that this testimony of

the engineer is flatly contradicted by the fireman, as well as by other witnesses, who saw the approach of the train, and is inconsistent and irreconcilable with the physical facts of the case as disclosed by the plat in evidence.)    Continuing, this witness said that he stopped the engine right in front of the little office in the depot. When he saw the "red board," he had passed out of the curve. "You cannot see the red board at all until you do that." On being recalled, the engineer repeated his statement that he saw Mr. Potter on the track at the time he looked for the "red board" and while he was looking out at the side window. When he looked for the "red board," to see if it had been turned, he saw Potter on the track, but he (witness) was near the depot, down to the crossing; says he expects he was one hundred feet or more from his usual stopping place when he looked to see if the "red board" was turned in answer to his signal, and was then about sixty or seventy feet north of the north end of the platform and was then turning on the air; was setting the air-brakes when he saw the "red board." On cross-examination, he said that he called for the "red board," under the company's rules, because he wanted them to turn on the white side as a signal that he could go ahead. Prior to the time he called for the "red board" he had not released the air theretofore applied for checking down the train for the regular stop; does not know what the crossings are called; there were two; one at the tank and one near the depot, between that and the depot; "didn't know which you call them. I was at the one nearest the depot."

The foregoing is the account given by the engineer and fireman of the train, as to the coming of the train and the accident as they saw it. As against this testimony for the defendant and as an example of the testimony of the plaintiff, the incident is described about in this way, following the testimony of one who was an eye witness. This witness was on the platform,

about one-third of the way between the depot proper and the north end of the platform, the platform being two hundred feet long. Mr. Potter entered upon the railroad track at the street crossing and started toward the depot. He first started down through the middle of the track and afterwards turned toward the west, that is, toward the side on which the depot platform is located. The east edge of the platform is just clear of the ends of the ties; there is about a step from the end of the ties to the first step of the platform. Potter walked very slowly; didn't appear to be able to walk very fast. When he got on the track, the train was just coming in sight of those at the depot. Potter raised his head, when he came on the track; was coming with his head dropped down very low. When he got on the track, he raised his head up, "like he was looking over the town," and threw his head around before he turned to walk down the track, and then dropped his head on his breast and did not look back again. The first time that the train whistled, was for the station, and it was then about half a mile from the station. The first whistle is sounded when it comes in sight of the station, then it whistles for the crossing north of town, which is close to the tank, and then whistles for the station, and then it usually calls for the signal, that is, gives four short whistles, and after they come in sight of the depot, they usually answer the signal which tells whether or not they shall stop for orders. This whistle is two blasts, and this is the one that is given about half a mile north of Holland. Four whistles were for the crossing, one for the station, a long whistle, the four whistles for the crossing. They whistle for the station and right after that they whistle for the road crossing. When they blew the whistle for the board, that is for signal orders, sounding four whistles, they are about a quarter of a mile north of the depot; by the time they are through with the four short whistles, they are getting in where they could see the board from the depot

and they answer that board with two short whistles immediately after the four whistles. The last whistles were sounded about the time Potter came on to the track, and they were sounded when the train was about a quarter of a mile above the town. The four whistles are sounded fast, then there is a short interval and they answer the board with two more; in the intervening time the train has run some little distance. They also had whistled for the road crossing north of the depot which is about half a mile north of town. They did not whistle for the street crossing. At the time the train was at the street crossing, Potter was walking down the track. There was nothing to have prevented people on the engine or in the engine cab from seeing him. They could easily see the signal board. There was no reason why they could not see a man on the track, Potter being between them and this signal board, which latter is up in the air, and Potter walking on the track between the depot and the train. The whistle was not sounded between the road crossing north of town and the street crossing just north of the depot. The next time the whistle was sounded after blowing for the road crossing was just about the time they hit Potter; sounded possibly forty feet north of the platform, and at that time Potter was between the engine and the platform, and they whistled when about forty feet north of the platform. At most, they were forty feet from Potter at the time they whistled. They were already at the street crossing when they whistled and not over thirty or forty feet from it and then sounded something like three or four whistles. The time between the blowing of this whistle and striking Potter was very short; it could hardly be counted in seconds; it was hardly more than one second. At the time these three short whistles were sounded Potter was on the track, that is, was on the end of the ties, and while the third or fourth blast was being sounded, the blasts being sounded very rapidly, the train hit him. "Of

course these blasts were sounded very fast," said witness, "came short and fast, and there were three or four of them." When these were sounded Potter was on the end of the ties, preparing to step outside of the rails; was stepping from the end of the ties to the platform. The pilot beam, as it is called, the heavy beam on the front of the locomotive, is what hit him. It struck him in the small of the back, knocked him something like seven or eight feet upon the platform, threw him up across the platform, and he went some six, seven or eight feet and fell back, off the platform between the track and the platform. It was done so quickly that witness could hardly tell how it was done. Potter seemed to light on his face; it threw him on his stomach and face and when "he lit, he lit rolling, went right over." He was on the end of the ties when these last whistles or blasts were sounding, walking toward the platform steps, evidently to get upon the platform. Witness did not notice any attempt to stop the train before it hit Potter. There was no more than the usual checking up of the train as it enters the station. Had measured the distance that the train ran after it struck Potter and it was something like one hundred and ninety feet from where the front end of it hit him to where it stopped. They commenced checking as they came around the curve, up some two hundred yards north of the depot. At the time the three or four short blasts were given and immediately before Potter was struck, to the best judgment of the witness, the train was going at a rate of five or six miles an hour. If the wheels of the engine were reversed, witness said, he did not notice it, although he was looking at the train. They did not stop the engine before they hit Potter. The roadway or track curves slightly but there were no obstructions on the curve or by reason of the curve to prevent any one on the engine seeing a man along the track when the observer was as high up as the engineer is in the cab, and nothing to prevent a man

in the engine cab from seeing between the road crossing
and the street crossing, that man being in the cab of the
engine. "A man can stand anywhere along in the curve
and see to the depot."

Without going further into the testimony than as
above, it is sufficient to say that, as is usual in cases of
this kind, there was more or less contradiction between
the several witnesses as to the speed of the train, and
exactly where it stopped, and as to the number of times
the engineer had blown the whistle, where he had blown
it, as to the ringing of the bell, and also as to the
possibility of the engineer having stopped the train
before, he seeing the imminent peril of the deceased.
We think the synopsis we have given as above fairly
presents both sides.

At the instance of the plaintiff the court gave four
instructions and out of eighteen which were asked by
the defendant it gave sixteen, also refusing an instruc-
tion in the nature of a demurrer to all the evidence.
The two instructions refused were, first, that under
the pleadings and evidence in the case, if the jury find
the issues for plaintiff, they cannot assess her damages
at more than the sum of $2,000. The second instruction
refused was to the effect that although the jury may
believe from the evidence that persons were in the
habit of walking along the railroad track from the road
crossing to the station platform, this did not, under
the facts in the case, impose upon the engineer any
duty to exercise reasonable care and be on the lookout
for persons on the track at that point, and that if they
found from the evidence that after the engineer dis-
covered the deceased was in a perilous position, he had
warned him by sounding the whistle or ringing the bell,
or by both, and used all means to stop the train con-
sistent with the safety of himself and the train but
could not do so in time to avoid injuring him, they
should find for the defendant. When we enter upon the
discussion of the case, we will take up the instructions

given, on which error is assigned, as far as is necessary
to understand the case.   The jury returned a verdict
in favor of plaintiff for $3,000.   After the interposition
of a motion for new trial, which was overruled, an
appeal was taken to this court by the defendant, ex-
ceptions being duly saved to the action of the court
in giving and refusing instructions and overruling the
motion for new trial.

REYNOLDS, P. J. (after stating the facts).—
The principal errors relied upon for a reversal of the
case, in the very earnest argument which was made
before the court by one of the able counsel for the
defendant, and which have been elaborately briefed, are
the refusal of the court to direct a verdict in favor of
the defendant at the conclusion of the case, and to
giving the defendant's fourth instruction after having
given the first and second instructions at the instance
of plaintiff, it being claimed that the first and second
instructions given at the instance of plaintiff are in
conflict with the fourth instruction given at the instance
of defendant.   It is claimed that these are reversible
errors.

The first instruction refused, in which the court
was asked to instruct the jury that if they found for
plaintiff they could not assess her damages at more
than the sum of $2,000, is contended for on the ground
that there was no evidence of wantonness or aggrava-
tion, but that all of the circumstances were mitigating
and that the jury, in cases of that kind, must consider
the mitigating circumstances and cannot, in their own
discretion, and in the absence of a showing of aggra-
vation or wantonness, impose anything more than the
minimum penalty.   There are two objections to this
argument.   In the first place the statute itself (Acts
1905, p. 136) fixes the penalty for cases in which death
results from the fault or negligence of the defendant

at the sum of not less than $2,000 and not exceeding $10,000, "in the discretion of the jury." We do not think that this changed the law as it existed before, any further than that instead of a fixed sum, as provided in section 2864, Revised Statutes 1899, before the amendment, the sum authorized by the amendment is a sliding or variable one; that sum left to the discretion of the jury, and the court is no more vested with power, by this section, to fix the amount at $2,000 in any case than it is authorized to sustain a verdict for an amount in excess of $10,000. Section 2864, as amended in 1905, remains as before in that it imposes a penalty on one coming within its provisions, the only difference being that the penalty is any sum in the discretion of the jury, within the limits provided.

In the next place, if it is the law that the discretion of the jury, in the matter of damages, is to be controlled by the court by way of instructions, it was incumbent on the defendant, if it desired to have the jury controlled in the exercise of its discretion, to have asked for an instruction to that effect. No instruction as to the measure of damage was asked by defendant, other than this first instruction, and the only instruction as to the damages asked by the plaintiff, and given at her instance, was the fourth instruction, which told the jury that under the law, if they found for plaintiff, their verdict must be in a sum not less than $2,000 and not more than $10,000.

Our Supreme Court has determined that where a party has neglected to ask for an instruction setting out the proper measure of damages, he cannot be heard to complain that the jury were not properly directed as to the amount or measure. [Wheeler v. Bowles, 163 Mo. 398, l. c. 409; Geismann v. Missouri-Edison Electric Co., 173 Mo. 654, l. c. 679.] The instruction as to the measure of damages within the limits not having been asked, the propriety of an instruction of that kind, under this amendment to the section, is not before us.

We do not express any opinion as to whether it is proper for the court, under the amendment to section 2864, to endeavor to control the jury as to the amount, any further than that they are to be kept within the limits fixed by that section as amended. It is, however, as much the law since the amendment, as it was before, that it is a defense to the recovery of any amount, to prove that "the injury received was not the result of unskillfulness, negligence or criminal intent." The Act of 1905 made no change in this. The present action is under section 2864, not under section 2866.

Moreover, if we are at liberty to inquire into the amount of the award, our right to do which we are neither deciding or considering for the reasons before given, we are not at all impressed with the argument, that $3,000 was an excessive award, assuming that a verdict for plaintiff was proper. In a case of this kind and under the testimony in it, if the jury found for plaintiff, before the amendment of 1905, to section 2864, she would undoubtedly have been entitled to $5,000 for the death of her husband. In this case the defendant itself brought out the fact that the husband was practically the sole support of his wife and three children, and we are all of the opinion that the defendant has no cause whatever to complain of the amount of this verdict. A careful consideration of the testimony of the engineer and fireman alone, discarding all testimony offered by plaintiff, in our judgment, shows such negligence as to closely border on criminal carelessness. The very fact that an old man was slowly walking along the track, head down, making for the outer rail, obviously unconscious of the approaching danger ought to have put those in charge of the train on guard. Indeed, facts in this case, as disclosed by all the testimony, strikes us as one so close to the borderland of criminal recklessness as to suggest a doubt whether the responsibility

136 App—10

for it should not be lifted from the defendant and placed upon those responsible for the death of a human being. [Kinlen v. Met. St. Ry. Co., 216 Mo. 145.]

The first and second instructions given at the instance of plaintiff are claimed to be inconsistent with the fourth instruction given at the instance of the defendant. To fully appreciate this proposition, it will be necessary to set out these three instructions in full. Numbers 1 and 2 given at the instance of plaintiff are as follows:

"I. The court instructs the jury that if you believe from the evidence, that the engineer or fireman, or other employees in charge of the train which struck the deceased, saw the deceased on the track, and if you further believe that the deceased was unaware of his peril, and was proceeding along the railroad track unconscious of the approaching train, then it was the duty of such engineer or fireman, or other employees of defendant, so observing the deceased, to give him proper warning of the approaching train, and it was his duty to give such warning by such a signal, as was within his power as could be likely heard and would be likely heard by any person possessing in an ordinary degree the sense of hearing in the position the deceased occupied. And if such signal was given and unheeded, then it was the duty of such employee to stop said train, provided said train could be stopped with safety to those on board of the same, and unless, at the time of the injury, the employees of the defendant in charge of said train used the means at their command to provide for the safety of deceased, after they discovered his imminent peril, the jury may find a verdict for the plaintiff in this case, although you may believe the said Jonathan Potter was guilty of negligence in being upon the track of defendant and in permitting himself to be inattentive to the danger surrounding him.

"II. The court instructs the jury that if you believe and find, from the evidence, that Jonathan Potter, at the time he was killed, was the husband of the plaintiff, and that this suit was brought within six months after his death, and shall further find from the evidence that the place of defendant's track where the deceased was struck by defendant's train was in the town of Holland and between a public street crossing of said railroad track and defendant's depot and railroad station at which all of defendant's passenger trains made regular stops, and that the track at the time was in such a condition and position for a long distance northeast from the point of the catastrophe that a person walking thereon could have been seen by the persons in charge of said train by the use of ordinary care and diligence, and that said track at the place where Potter was killed and northeast up said track to the public street crossing, from the time said railroad was constructed and up to and was at the time said Potter was struck and killed, frequently used by pedestrians in going to and from said public street crossing, and the depot and the railway station of defendant; and that said Jonathan Potter, while walking on defendant's track, became in imminent peril of being struck by defendant's train, and defendant's employees in charge of said train became aware of his peril of being struck in time to have enabled them, by the exercise of ordinary care, to have stopped said train and to have averted the injury to deceased, and they failed to exercise such care and stop said train, and that by reason of such failure to exercise such ordinary care and stop said train, and that by reason of such failure to exercise such ordinary care said train was not stopped, and said Potter was struck and killed by said train, then the jury must find for the plaintiff, though you may find that the deceased, Jonathan Potter, was guilty of negligence in walking on defendant's track at the time. And by ordinary care is meant such care as an ordi-

narily careful and prudent person would exercise under the same or similar circumstances."

The fourth instruction given at the instance of the defendant is as follows:

"IV. The court further instructs you that it was the duty of Jonathan Potter, plaintiff's deceased husband, to look in both ways and listen for the approach of the trains on the railroad track. And if, at any time before he was injured, he could either by looking or listening, have known of the approach of the train in time to have got off of the track and avoided the accident, then plaintiff is not entitled to recover in this case, and your verdict must be for the defendant."

It is, possibly, necessary, even at the risk of being prolix, in passing on this fourth instruction, to notice as briefly as possible, the remaining fifteen instructions, which were given at the instance of the very industrious counsel for defendant.

The first instruction told the jury that the burden of proof in the case devolved on plaintiff; that she must establish her case by the preponderance of the evidence and unless she had done so they must find for the defendant.

In the second instruction the jury were told that the fact that the unfortunate defendant was a corporation should make no difference in their consideration of the case.

The third instruction told the jury that in determining the negligence of the defendant and the contributory negligence of the deceased, the jury were to take into consideration all the facts and circumstances detailed in the evidence, the interest of the witnesses in the result, the means that they had for observing the transaction as to which they testified, the attention they were paying to the transaction and their capacity to receive correct impressions.

The fifth instruction told the jury that if they believed that the deceased's hearing was impaired at the time of the injury, it was improper for him to go on the track and walk thereon at the point where he did, "without first ascertaining whether or not any train was approaching; and if you believe from the evidence that after he stepped on the track the engineer sounded the whistle and rang the bell, or did either, and thereupon the deceased walked as though he was going to leave the track, then the engineer was justified in believing that he was leaving the same and would go to a place of safety, and under the circumstances the engineer was not required to do anything more to avoid injuring him, even though you may further believe from the evidence that the deceased had not entirely got off the track or if he got off the track he was not far enough away to be out of danger."

The sixth instruction told the jury that if they found that the deceased resided in the town of Holland, near the place where he was injured, was familiar with the track at that point, knew that trains and engines were passing daily thereon and was familiar with the time which the train which struck him would arrive, that he was hard of hearing, "and that there was no obstructions for some distance before he reached the railroad track, or after he got thereon, to prevent him from seeing the train approaching, if he had looked in that direction; and that he walked on the road and on the track and got in the way of the train, without looking to see if the train was approaching;" and that the engineer sounded the whistle and rang the bell, or did either, and that persons called on him to get out of the way of the train and that he moved as though he was going to leave the track but did not get off of the track, or far enough away to avoid being struck, they should find for the defendant.

The seventh instruction told the jury that the engineer in charge of the train was not required to make

an effort to stop the train to prevent injuring him until he had placed himself in imminent peril on the track, and if after he had done so it was too late for the engineer to stop in time to avoid the injury, plaintiff could not recover, and that no rate of speed in running the train was negligence on the part of the defendant under the issues in the case, "however fast the same may have been."

The eighth instruction told the jury that the engineer in charge of the train owed the deceased only that degree of care which an ordinarily careful and prudent man, engaged in the same business, would have exercised under like and similar circumstances, after he discovered or by the exercise of ordinary care might have discovered the perilous position of the deceased on the track, and if they believed that the engineer exercised that care they should find for the defendant.

The ninth instruction told the jury that if the engineer used ordinary care in the management of the train and as soon as he saw the deceased in a perilous position on the track, or by the exercise of ordinary care might have seen that he was in a perilous position, he used such care and caution in stopping the train to avoid the injury to the deceased as a person of ordinary care and prudence would have exercised under like and similar circumstances, they should find for the defendant.

The tenth instruction told the jury that although they might believe from the evidence that the engineer in charge of the train saw Potter on the track in time to have stopped the train and avoided injuring him, and did not know Potter was hard of hearing or deaf or infirm in body, if those were facts, still the engineer had a right to presume that Potter would at once step off the track and avoid injury and the engineer was not required to stop the train until he discovered that Potter was in a position of peril, and if, after discovering his perilous position, he warned him by sounding

the whistle or ringing the bell and used all means to stop the train consistent with the safety of himself and the train but could not do so in time to avoid injuring him, they should find for the defendant.

The eleventh and twelfth instructions repeat this in a stronger form, if possible, in favor of defendant.

The thirteenth instruction was as to the weight to be given to the statements of two absent witnesses for defendant, the jury being told that they were to consider those statements as if the witnesses had been present and had sworn to them.

The fourteenth instruction told the jury that it was not negligence on the part of the employees of the defendant in running its train at the place where Potter was killed at a high rate of speed, if they found that it was running at a high rate of speed, and that they could not find a verdict for plaintiff on account of the rate of speed at which the train was running.

The fifteenth instruction told the jury that even if they found that there was water alongside of the railroad dump, or that the ground was muddy, these facts, if they were found, did not excuse Potter from stepping off the track and out of the way of the train, if it was necessary for his safety.

The sixteenth instruction told the jury that if Potter was deaf, or his hearing was defective and his eyesight impaired, and he had bodily infirmities and was aged, this did not excuse him in going upon the railroad track (in the language of the instruction, *"from going upon the railroad track"*), and exposing himself to the danger of being struck by the train, but that the law under such circumstances would require him to be more vigilant and prompt to employ all his faculties so as to compensate as far as possible for his lacking ones in order that he might protect himself from danger.

We are unable to see where there is any real conflict between the fourth instruction given at the in-

stance of the defendant and the first and second given at the instance of the plaintiff. It might have been, with a few verbal changes, incorporated into those instructions, without varying the law as set out in those instructions, although rather too harshly as against plaintiff. The fourth instruction, as asked, involves a physical impossibility, if it is to be taken literally. It assumes that it is possible for a man, walking along a railroad track or for that matter a public highway, to be looking both ways at once, and listening. The listening is practicable,—to look in both ways at once while a man is walking along would require a change in the human anatomy. Taken literally, the instruction was erroneous. As applied to the facts in this case it was erroneous. It was an error of defendant, and one cannot invite error and then complain of that error. [Phelps v. City of Salisbury, 161 Mo. 1, l. c. 14; Wolfe v. Supreme Lodge, 160 Mo. 675, l. c. 686.] Over and above this, however, if there was a case in which a defendant had no right whatever to complain of the action of the court in giving instructions, this is one of them. Every proposition that by any possible theory it was entitled to have presented to the jury, was covered by these instructions, and that too, defendant's own view of the law as applied to the facts. They are so radically favorable to the defendant that we refuse to go on record as indorsing them, not because wrong in their statements of the law, but because entirely too favorable to defendant under the facts in this case. We are not obliged to go into an examination of them, however, any further than we have, as the plaintiff, with all this burthen thrown upon her by these instructions, is not here complaining.

Complaint is made that a witness not shown to have been an expert as to speed, was permitted to testify as to the speed of the train, and that on his estimate of the speed, another witness, who was an expert but not an eyewitness of the accident, was, in answer to a hypo-

thetical question, allowed to give his opinion as to the time in which a train going at that rate of speed, could have been brought to a stop. It is not necessary to qualify a witness to testify in regard to the speed of a train, that he be an expert; if he is familiar with trains and accustomed to seeing them run, that is sufficient. [Donaldson v. Railroad, 128 Mo. App. 245, l. c. 247.] That was shown to be the case with the witness who had testified to the speed at which this train was going when the accident occurred.

Complaint is made of allowing a lady passenger to testify that she felt no jar from any sudden stopping of this train. The engineer himself testified that the application of the air and the sudden stopping of the train would have resulted in as sharp a jar as in case of a collision. Surely the testimony of a lady passenger, sitting in the rear coach at the time of the accident, that she had felt no jar, was competent in determining the fact whether or not the engineer's testimony was true when he had sworn that he did apply the air and bring the train to a sudden stop.

Other points are made which do not consider necessary to take up. None of them involve error to the manifest prejudice and hurt of the defendant. On careful consideration of the facts in evidence, of the rulings of the trial judge, of the instructions given, we are all of the opinion that this case comes distinctly within the decisions of this court and of the Supreme Court in the cases of Klockenbrink v. Railroad, 81 Mo. App. 351, approved in the same case by the Supreme Court in 172 Mo. 678, and of the case of Barrie v. Transit Co., 119 Mo. App. 38. The doctrine adopted and announced in these cases, taken from Shearman & Redfield on the Law of Negligence, is the law of this State. We can do no better than to quote from that accepted authority this language, for it will bear reiteration in cases where human life has been lost: "It is now perfectly well settled that the plaintiff may recover damages for an

injury caused by the defendant's negligence, notwith-standing the plaintiff's own negligence exposed him to the risk of injury, if such injury was more immediately caused by the defendant's omission, after becoming aware of the plaintiff's danger, to use ordinary care for the purpose of avoiding the injury to him. We know of no court of last resort in which this rule is any longer disputed; although the same rule, in substance, but inaccurately stated, has been made the subject of strenuous controversy. But, furthermore, the plain-tiff should recover, notwithstanding his own negligence exposed him to the risk of injury, if the injury of which he complains was more immediately caused by the omis-sion of the defendant, after having such notice of the plaintiff's danger as would put a prudent man upon his guard, to use ordinary care for the purpose of avoiding such injury. It is not necessary that the defendant should actually know of the danger to which the plain-tiff is exposed. It is enough if, having sufficient notice to put a prudent man on the alert, he does not take such precautions as a prudent man would take under simi-lar notice. This rule is almost universally accepted." Referring to the case of Davies v. Mann, 10 Mees. & W. 546, for the principle underlying the rule, the learned commentator continues, "That principle is that the party who has the last opportunity of avoiding accident, is not excused by the negligence of any one else. His negligence, and not that of the one first in fault, is the sole proximate cause of the injury." [1 Shearman & Redfield, Law of Negligence (5 Ed.), sec. 99, top pp. 153 and 154.]

The man in the case before us who had the last chance of avoiding the danger, the last opportunity of avoiding the accident, cannot be excused by the prior negligence of this unfortunate old man who met his death. The negligence of the servant and employee of the defendant, not that of this old man, was the direct, im-mediate, proximate cause of the injury. There was evi-

dence in this case tending to prove, that by the exercise of ordinary care, the engineer could have seen the deceased on the track in time to have saved his life by the exercise of ordinary care thereafter and, to repeat, in such cases, it is the settled law in this State that the plaintiff may recover. [McQuade v. Suburban Ry. Co., 200 Mo. 150, l. c. 158, and cases there cited.] The last reference to the Klockenbrink case by our Supreme Court which has come to our knowledge, is in Sander v. Transit Co., 206 Mo. 445, l. c. 463, where it is cited approvingly.

We hold that the trial court was entirely right in overruling the demurrer interposed by the defendant at the close of the case and that the verdict is a righteous verdict, under the facts in evidence, and the action of the trial court in refusing to set that verdict aside and grant a new trial is correct. Its judgment is affirmed. All concur.